STATE OF MAINE
Knox, ss., Clerk of the
SUPERIOR COURT

MAR 3 1 2005

RECEIVED AND FILED
Susan Gullette, Clerk

STATE OF MAINE

KNOX, ss.

SUPERIOR COURT
CIVIL ACTIONS
DHM - KAN -

THE LANE CONSTRUCTION
CORPORATION,

      Plaintiff

    v.

    DOCKET NO. AP-03-013

TOWN OF WASHINGTON,

      Defendant

***************************************************

LAND ASSOCIATION OF
WASHINGTON, *et al.*,

      Plaintiff

    v.

    DOCKET NO. AP-03-011

TOWN OF WASHINGTON, *et al.*,

      Defendant

## DECISION AND ORDER

This matter is before the court on M.R. Civ. P. 80B petitions by plaintiffs Land Association of Washington[1] and The Lane Construction Corporation,[2] plaintiffs in separate petitions seeking review of governmental action.

The present complaints arise out of The Lane Construction Corporation's (hereinafter "Lane") proposal to operate a hard rock quarry, rock crusher, concrete batch plant and bituminous hot-mix (asphalt) plant on a parcel of land in the Town of

---

[1] The other named plaintiffs in this complaint include individual town residents who own land abutting a parcel subject to a lease held by The Lane Construction Corporation, as well as other town residents who live farther from said parcel.

[2] The Lane Construction Corporation is also a named defendant in Land Association of Washington's complaint.

Washington's Farm and Forestry (FF) district. On March 22, 2001, Lane filed an application with the Town, requesting a conditional use permit for the aforementioned activities. On May 10, 2001, the Washington Planning Board (hereinafter "the Board") held the first of thirteen public hearings on the application. At these hearings, both Lane and the Land Association of Washington (hereinafter "LAW") provided testimony and documentary evidence in support of their differing views as to the legality of the proposal in light of the applicable Land Use Ordinance (hereinafter "the LUO"). On January 16, 2002, the Board considered a motion that the asphalt and concrete plants are not "accessory uses" as contemplated by the LUO, and therefore, those portions of the permit application should be denied. This motion passed by a vote of 3-0, with two board members abstaining. As a consequence of this vote, Lane officially withdrew the plants from consideration as part of the application. Thereafter, on January 16, 2002, the Board considered a motion that the quarry and the rock crusher go "hand-in-hand". This motion also passed, this time by a vote of 3-2. The "hand-in-hand" phraseology was used by the Board as an expression of their view that both quarrying and crushing are part of the process of "mineral extraction" contemplated by the LUO. In taking this vote, the Board specifically foreclosed the possibility of finding rock crushing to be a use accessory to the quarrying operation.

On August 5, 2002, the Board issued its final decision granting Lane a conditional use permit "to operate and maintain mineral extraction and crushing operations". The opinion also referenced the Board's earlier decision to deny Lane's permit request for the asphalt and concrete plants, stating that "they were manufacturing in nature and not listed as an allowable use for the FF district". The Board also imposed various conditions for approval of the permit, including the reimbursement by Lane of over $20,000.00 in costs the Town incurred in the hearing process.

Both LAW and Lane appealed the Board's decision to the Washington Board of Appeals. On June 11, 2003, the Board of Appeals issued its opinion that the Planning Board had correctly addressed the quarry and plants, but that its findings relative to the rock crusher were "clearly contrary" to the LUO and had to be overturned. The Appeals Board also upheld the Planning Board's determination that Lane must reimburse its costs.

Lane timely filed its Rule 80B complaint on June 26, 2003. Lane seeks to overturn the Board's decision that the concrete and asphalt plants are prohibited in the FF district and that Lane is required to reimburse the board for costs associated with the hearing process.

LAW timely filed its Rule 80B complaint on June 18, 2003. LAW seeks to overturn the Board's decision granting Lane's conditional use permit to operate the quarry and rock crusher.

On appeal, this Court independently examines the record and reviews the operative decision of the municipality for "error of law, abuse of discretion, or findings not supported by substantial evidence in the record." *Yates v. Town of Southwest Harbor*, 2001 ME 2, ¶ 10, 763 A.2d 1168, 1171 (citing *Sproul v. Town of Boothbay Harbor*, 2000 ME 30, ¶ 8, 746 A.2d 368, 372. The substantial evidence standard requires the court to examine the entire record "to determine whether on the basis of all the testimony and exhibits before the [board] it could fairly and reasonably find the facts as it did." *Ryan v. Town of Camden*, 582 A.2d 973, 975 (Me. 1990) (quoting *Seven Islands Land Co. v. Maine Land Use Regulation Comm.*, 450 A.2d 475, 479 (Me. 1982)). The court is not permitted to "make findings independent of those explicitly or implicitly found by the board or [to] substitute its judgment for that of the board." *Perrin v. Town of Kittery*, 591 A.2d 861, 863 (Me. 1991). "The board's decision is not wrong because the record is inconsistent or a

different conclusion could be drawn from it." *Twigg v. Town of Kennebunk*, 662 A.2d 914, 916 (Me. 1995). To prevail, the plaintiff must show "not only that the board's findings are unsupported by record evidence, but also that the record compels contrary findings." *Total Quality v. Town of Scarborough*, 588 A.2d 283, 284 (Me. 1991). "Whether a proposed use, principal or accessory, falls within a given categorization contained in a zoning regulation is a question of law...." *Singal v. City of Bangor*, 440 A.2d 1048, 1051 (Me. 1982).

If the board of appeals acted as a tribunal of original jurisdiction, that is, as fact finder and decision maker, the court reviews its decision directly. *See Stewart v. Town of Sedgwick*, 2000 ME 157, ¶ 4, 757 A.2d 773, 775. If, however, the board acted only in an appellate capacity, the court reviews directly the decision of the planning board, not the board of appeals. *See Id*. In the absence of an explicit ordinance creating a purely appellate review, a municipal board must conduct a hearing de novo[3]. *See Id* ¶ 7, 757 A.2d at 776.

## 1.     The Implications of the *Beckley* Decision

LAW raises the argument that the Law Court's decision in *Beckley v. Town of Windham*, 683 A.2d 774 (Me. 1996), required the Board to deny Lane's application in its entirety. In *Beckley*, the applicants sought a permit from the Windham Planning Board for the construction of a boat rental facility on land situated within the Town's "Resource Protection District" or "RPD". The proposed facility was to include a gravel parking lot, a twenty-four by twenty-eight foot building, walkways, a storage rack, and a temporary dock. The Town's zoning ordinance permitted marinas, private recreation

---

[3] All parties agree that this Court's review must focus solely on the Planning Board's decision and not the decision of the Board of Appeals. Insofar as the LUO only authorizes the Board of Appeals to conduct an appellate review, and that its review was in fact limited to that extent, it appears that this Court should review the Planning Board's decision directly. *See* Washington, Me. LUO, Art. X, § 3(1) (March 23, 2002); AB-30, pp. 1-6.

areas and "accessory structures" within the RPD, but it specifically prohibited "commercial structures". The Law Court, in determining that the building qualified as a commercial structure, remanded the case to the Superior Court with instructions to vacate the entire permit and not just the portion of the permit allowing construction of the building. According to LAW, *Beckley* stands for the proposition that where a land use permit application includes both permissible and prohibited uses, Maine law requires the denial of the entire permit. Hence, because Lane, like the applicants in *Beckley*, presented a single application containing both permissible and prohibited uses, the Board's determination that certain of the proposed uses were forbidden prevents it from approving any part of the request.

In response, Lane attempts to distinguish *Beckley* from the present case by noting that the Washington LUO does not specifically ban rock crushers and, moreover, rock crushers and plants are allowable as integral and/or accessory to mineral extraction anyway. The Town also attacks the relevance of *Beckley* to Lane's application. The Town asserts that, unlike *Beckley*, the application at issue here consists of separate and distinguishable components, any one of which can be removed "without unwinding the entire permit". Also, the Town notes that *Beckley* is the reverse situation from that presented here. Specifically, Lane's project as currently approved includes only the rock quarry, a use that all parties apparently would agree is permitted under the LUO, whereas in *Beckley*, the Law Court examined a proposal that still included prohibited uses that were erroneously allowed.

After due consideration, this Court concludes that *Beckley* does not require it to vacate the permit issued to Lane. Nowhere within that decision did the Law Court opine that where a permit application contains a prohibited use, the entire application must be denied. In light of the Law Court's silence on this point, this Court declines

LAW's invitation to expand the holding of *Beckley*. Hence, even if it is determined that the rock crusher and/or the plants are forbidden under the LUO, the decision to permit the operation of a rock quarry will stand. Likewise, if it is determined that the rock crusher is a permissible use in the FF district, that decision of the Board will stand as well.

## 2. The Rock Crusher

Throughout the hearing process and subsequently, Lane has asserted two distinct theories to support its claim that the rock crusher is a permissible use within the FF district. In particular, Lane, at various times, has characterized the rock crusher as "integral" to quarrying operations, implying that it falls within the ambit of "mineral extraction" under the Washington LUO. Thus, according to this view, the rock crusher would be considered part and parcel of the primary use under consideration. In other instances, however, Lane has asserted that the rock crusher is permissible under the LUO as a use "accessory" to the quarrying operation. Under this view, the rock crusher would apparently be considered a use in and of itself, separate from the rock quarry. Adding to the confusion, Lane, in its Rule 80B briefs submitted in conjunction with the present cases, has apparently devised a third argument that blurs this distinction, suggesting that a use may be both integral and accessory.

Although the Board's written findings do not explain which of Lane's arguments it accepted, an examination of the transcripts taken from public hearings on the application reveal that the Board considered the rock crusher to be integral, and not accessory, to the quarry. During the public hearing of January 16, 2002, Board Member Wendell Ware made a motion that the rock crusher "goes with the quarry hand in hand". Transcript, pg. 656, line 18. Shortly thereafter, in response to a question about whether the crusher might still be deemed accessory, the Board Chairman stated "no",

and then explained that "It's got to go one way or the other here". The Chairman further clarified that a vote in favor of the motion would express the conclusion that rock crushing was "part of the process" of quarrying. Board Member Ware's motion subsequently passed by a vote of 3-2.

The foregoing recitation shows that the Board interpreted the phrase "mineral extraction" as it appears in the LUO to include the processing of mined materials with a rock crusher. The interpretation of a zoning ordinance is a question of law that is reviewed de novo. *See Priestly v. Town of Hermon*, 2003 ME 9, ¶ 7, 814 A.2d 995, 997 (citing *DeSomma v. Town of Casco*, 2000 ME 113, ¶ 8, 755 A.2d 485, 487). In addition, the Law Court has explained that no deference is given to the interpretations of zoning ordinances by local volunteer boards. *See Isis Development, LLC v. Town of Wells*, 2003 ME 149, n. 4, 836 A.2d 1285 (Some Law Court decisions mistakenly merged de novo and deferential reviews).

In pertinent part, the Washington LUO defines "mineral extraction" as "any extraction of mineral deposits, including gravel...." Washington, Me. LUO, Art. XIII, § 2 (March 23, 2002)[4]. This definition, however, is vague at best. The LUO also provides that "all words not defined herein shall carry their customary and usual meanings". *Id.* at § 1. Accordingly, Black's Law Dictionary defines the root word "extract" as "to draw out or forth; to pull out from a fixed position". BLACK'S LAW DICTIONARY 605 (7th ed. 1999). In this definition there is no suggestion that pulverizing or otherwise reducing the size of an object in any way constitutes "extraction". To the contrary, it appears that

---

[4] In its brief, Lane also references the Town's "Mining Ordinance". According to Lane, this ordinance defines the phrase "mineral extraction activity" as "any excavation or removal, handling or storage of on-site extracted sand, gravel, borrow, rock, clay, minerals, or topsoil to include, but is not limited to sand or gravel pits, clay pits, borrow pits, quarries, mines, and topsoil mining or removal". Further, Lane asserts that the Mining Ordinance defines "handling" as "any aggregate screening, mixing or storage of sand, gravel, stone, rock, clay, or topsoil; to include any mining of material". *See* Lane Brief, pp. 11-12. Strangely, this ordinance appears in neither the compilation of town ordinances submitted nor anywhere else in the administrative record.

the ordinance as written merely contemplates the removal of the mineral from the ground in whatever form that entails. Thus, as a matter of law, "mineral extraction" under the Washington LUO does not include the operation of a rock crusher. The Board's determination that the rock crusher was integral to the quarrying operation was therefore erroneous and must be overturned.

In addition, it should be noted that *Inhabitants of Leeds v. Maine Crushed Rock & Gravel Co.*, 127 Me. 51, 141 A. 73 (1928), does not dictate a contrary conclusion on this issue. In *Leeds*, the dispositive question involved whether the crushing of quarried rock constitutes manufacturing. The Law Court held that it does not. Based upon this relatively straightforward holding, Lane leaps to the unwarranted further conclusion that crushing and extracting rock are not separate or distinct processes. A plain reading of *Leeds*, and particularly the passage cited by Lane, reveals no such proposition of law. *See Id.* at 56, 141 A. at 75.

Although operation of a rock crusher is not "mineral extraction", the Board may still properly permit this activity within the FF district if it meets the LUO's definition of "accessory uses". Pursuant to the authority cited above, the Board's interpretation that the rock crusher is not an accessory use within the meaning of the LUO is subject to de novo review and is afforded no deference.

In its brief in opposition to Lane's complaint, the Town raises the argument that a use accessory to a conditional use is not permissible under the terms of the LUO. The Town first notes that the LUO defines "accessory uses" as "uses clearly incidental and subordinate to a principle building or use *allowed* in the district in which it is located, and located on the same lot with such principle building or use" (emphasis in Town Opp. Brief). Washington, Me., LUO Art. XIII, § 2 (March 23, 2002). The Town then draws the Court's attention to the following provisions of the LUO:

B. *Allowable* Uses.

The following uses are *allowed* in the Forest and Farm District:

7. Accessory Uses.

*       *       *

C. Conditional Uses.

The Following uses may be *permitted* only upon approval as conditional uses in accordance with the appropriate provisions of this Ordinance.

1.      Mineral Extraction

*       *       *

(Emphasis in Town Opp. Brief). The Town believes it is significant that the subcategory "accessory uses" appears only under "allowable uses" and not under "conditional uses". Specifically, the Town contends that the absence of "accessory uses" in the "conditional uses" list shows a clear intent that uses accessory to a conditional use are not allowed. Furthermore, the Town highlights the fact that the word "allowed" appears in the definition of "accessory uses" and in the heading to the list of "allowable uses", but not in the heading to the list of "conditional uses", which instead uses the word "permitted". Reading the definition of "accessory uses" in conjunction with this language, the Town believes it is clear that an accessory use cannot attach to something that requires a conditional use permit.

In response, Lane points out certain other items on the lists of allowable and conditional uses that the Town left out of its discussion. In particular, Lane notes that also among the list of "allowable uses" are "home occupations" and "licensed babysitting services". Further, the list of "conditional uses" also includes "mobile home parks". Lane asserts that the logical extension of the Town's reasoning would be that no item listed under "allowable uses" could occur in any activity listed under

"conditional uses". But, given the existence of these other contemplated activities, the Town's argument would lead to absurd results. Indeed, it seems patently unreasonable to say that the drafters of the LUO meant to prohibit a home occupation or licensed babysitting services from occurring within a mobile home park.

Although it is far from clear, at least one provision of Article VII tends to show that the ordinance drafters probably did not attach any significance to their use of the term "allowed" as opposed to "permitted". Consider the following language as it appears in section 2, subsection E:

E. Prohibited Uses

Uses not permitted as an allowable or conditional use are prohibited within this district.

Washington, Me., LUO Art. VII, § 2 (March 23, 2002). If this Court is to accept the reasoning espoused by the Town, it would seem that the drafters should have expressed the foregoing as "uses not permitted as a conditional use or allowed as an allowable use...." Considering the language as actually drafted, however, in light of subsections B and C quoted above, the words "permitted" and "allowed" appear to be used interchangeably. Given this conclusion, the use of the word "allowed" as opposed to "permitted" in the definition of "accessory uses" cannot have the significance suggested by the Town. Moreover, insofar as accessory uses may properly attach to "use[s] allowed in the district", and that "mineral extraction" is an allowed/permitted use in the district, it seems that the Washington LUO condones accessory uses that accompany conditional uses.

The next step is to determine whether the rock crusher is in fact an accessory use. As discussed above, the outcome of the Board's vote of January 16, 2002, was not simply limited to the conclusion that the rock crusher is part of "mineral extraction",

but also that it is *not* an "accessory use".  Lane relies on *Town of Shapleigh v. Shikles*, 427 A.2d 460 (Me. 1981), in favor of its position that a use that goes hand-in-hand with or is integral to a principal use qualifies as a permissible accessory use.  In *Shapleigh*, the Law Court considered whether a building constructed pursuant to a permit that allowed the applicants to erect an "accessory guest house" was actually a "principal building".  In undertaking its analysis of the Shapleigh LUO, the Law Court adopted the holding of *Lawrence v. Zoning Board of Appeals*, 158 Conn. 509, 264 A.2d 552 (1969), wherein the Connecticut Supreme Court examined a local ordinance enacted by the Town of North Branford.  The operative provisions of the North Branford ordinance and the Shapleigh LUO are virtually identical to the ordinance presently before this Court, except that the Washington LOU modifies the term "incidental" with the word "clearly" instead of "customarily".  *Compare* Washington, Me., LUO Art. XIII, § 2 (March 23, 2002); *Shapleigh*, 427 A.2d at 465; *Lawrence*, 158 Conn. at 511.  The *Lawrence* court explained that for a use to be "incidental", "the use must not be the primary use of the property but rather one which is subordinate and minor in significance".  *Lawrence*, 158 Conn. at 512.  Additionally, with regard to the term "customarily", the court noted that "the use must be further scrutinized to determine whether it has commonly, habitually, and by long practice been established as reasonably associated with the primary use".  *Id.*

In light of the foregoing authority, Lane's assertion that an integral use is also an accessory use is without merit.  In fact, a plain reading of the *Lawrence* decision reveals exactly the opposite – that the accessory use *"must not be* the primary use" (emphasis added).  *Id.*

Even though rock crushing does not appear to fall within the LUO definition of, and is therefore not integral to, "mineral extraction", this Court may still interpret the LUO to include the rock crusher as an accessory use thereto.  In accordance with

*Lawrence*, the Law Court set forth various factors that in its view will determine whether a use is accessory within the terms of a zoning ordinance. *See Shapleigh*, 427 A.2d at 465. Specifically, the Law Court explained that "the size of the land area involved, the nature of the primary use, the use made of adjacent lots by neighbors, the economic structure of the area and whether similar uses or structures exist in the neighborhood on an accessory basis" will all bear on this issue. *Id.*

In its opposition to Lane's brief, LAW concedes that Lane established that a rock crusher is customarily found near a quarry. However, LAW also contends that the Board made no findings as to whether the crusher was clearly incidental and subordinate to the quarry or located on the same lot, as the LUO requires.

It appears that LAW is correct on this latest point, and therefore, the Board must make explicit findings of fact with regard to whether the rock crusher is an "accessory use" under the LUO. A review of the record before the Court reveals that although evidence on this issue may have been submitted, the Board effectively avoided it by interpreting "mineral extraction" to include the crusher. Insofar as this Court may not make findings of fact independent of the Board, this issue must be remanded to the Board with instructions to make findings of fact as to whether the rock crusher is an "accessory use" to "mineral extraction".

Although not specifically addressed by any of the parties, it seems that the use of the modifier "clearly" requires a more restrictive interpretation of the ordinance than the use of the word "customarily". The word "customarily" describes something that is commonly or habitually practiced. Similarly, the word "common" is defined as, *inter alia*, "occurring frequently or habitually". WEBSTER'S II NEW COLLEGE DICTIONARY 226 (1995). On the other hand, the root word "clear" is defined as, *inter alia*, "plain or evident to the mind: unmistakable; free from doubt or confusion: certain; free from

limitation or qualification: absolute". *Id.* at 208. Based on these definitions, it seems that for a use to relate "clearly" to a primary use, there must exist some aspect of necessity or indispensability. To the contrary, the use of the word "customarily" implicitly recognizes that there are some instances outside of the custom under which different standards or practices are adhered to. Hence, in that the factors enunciated in *Shapleigh* allow some leeway for a non-essential use to qualify as "accessory", they do not appear particularly apt when analyzing an accessory use under the Town of Washington's or a similarly worded LUO. Instead, it seems that under the proper interpretation of this ordinance, only those uses that are strictly necessary, yet subordinate to the primary use, and located on the same lot, may be deemed accessory. Therefore, when analyzing the LUO in light of factual determinations made upon remand, the rock crusher is "accessory" only if this more stringent standard is met.

### 3. The Concrete and Asphalt Plants

Lane contends that the Board committed legal error in concluding that the two plants are not accessory to the proposed quarrying operation, and therefore that decision must be overturned. Lane first notes that because the terms "incidental" and "subordinate" are not defined in the LUO, they must be given their common and usual meanings. The common meaning of "incidental" cited by Lane is something that is "dependent on or subordinate to something else of greater or principal importance". Lane Brief pg. 12 (citing WEBSTER'S NEW COLLEGIATE DICTIONARY 580 (1977)). Further, Lane asserts that the evidence submitted on this point was not contradicted and overwhelmingly supports its position that the plants are in fact accessory. In its brief, Lane recites a laundry list of facts, provided upon the Board's request, that compare various aspects of an operation containing only the quarry as opposed to an operation that also includes the plants. The various features discussed by Lane in its brief include

the volume of traffic, days of operation, number of customers, and the value of the cite. Lane also discussed various characteristics of the plants in terms that mirror the factors for evaluating a proposed accessory use espoused in *Shapleigh*. According to Lane, its statistical and valuation analysis of the proposed operations show the quarry to be the primary use, and the *Shapleigh* factors show the plants to be accessory.

In response, the Town first asserts the argument that the LUO does not permit uses accessory to conditional uses. This is the same argument addressed above and will not be repeated here. Second, the Town asserts that the plants are not subordinate to the quarrying operation. As support for this argument, the Town points to the same statistics and analysis relied upon by Lane, providing its own spin on the estimated impact of the plants on the volume of business and the value of the cite.

Based on the record of the proceedings, there exists competent evidence upon which to support the Board's conclusion that the plants are not accessory to the quarrying operation. In fact, Lane's own attorney admits that the plants are not necessary to the operation of the quarry. Considering the implications of the word "clearly" in the definition of "accessory uses" discussed above, this admission appears to undermine Lane's position entirely.

Lane also takes issue with the Board's characterization of the plants as "manufacturing" uses during the course of the public hearings as well as in its written opinion. Specifically, Lane believes the Board abused its discretion by simply making up a term without providing any substantive meaning or standards for it, then denying the plants because manufacturing uses were not expressly allowed in the FF district. Also, Lane contends that the board erred in not determining whether the plants qualified as accessory uses.

In its reply brief, the Town points out what it believes are misleading and inaccurate assertions set forth by Lane. In particular, the Town notes that the Board did in fact conclude that the plants were not accessory. In the portion of the hearing transcripts cited by Lane, the motion originally made was that the "asphalt operation and the concrete plant are not considered by the Board to be accessory uses...." Although there was subsequent discussion about the manufacturing nature of the plants, the Town notes that the proposed amendment to the motion to include this reasoning was never seconded. Further, after the vote, the Chairman referred to the motion as the "accessory use" issue. Therefore, in the Town's view, the Board sufficiently and properly addressed whether the plants were accessory.

It seems that the Board's categorization of the plants as a manufacturing does not provide grounds to overturn their decision. In addition to the transcript sections cited by the Town, the Board's written decision also indicates its specific conclusion that the plants were not accessory to the quarry. Further, insofar as the plants obviously do not fall into any other class of uses listed as allowable or conditional in the FF district, once the Board determined that they were not accessory, it is inconsequential that any other label was employed to describe them. This is so because the LUO clearly states that "uses not permitted as an allowable or conditional use are prohibited within this district". Washington, Me. LUO, Art. VII § 2(E). Regardless of whether or not "manufacturing" is defined in the LUO per se, the important issue for resolution by the Board was whether the plants were accessory, and that was decided.

After the Board voted to deny the plants, Lane formally withdrew them from further consideration as part of the proposal. On this basis, the Town asserts that the plants should not now be considered by this Court to be part of the application, and thus, no relief should be afforded to Lane.

In response, Lane asserts that the plants were withdrawn only after the Board took its vote, and therefore the withdrawal was moot. Lane likens the situation at hand to that of an attorney attempting to withdraw a count asserted in a complaint after the court has already granted the defendant's motion to dismiss that count. Further, Lane contends that the Board's vote denying the plants was not a "final action" ripe for appeal. Thus, Lane asserts that its only option was to wait until the Board issued a final decision with respect to the other aspects of the application, then appeal.

It is the Court's understanding that Lane's proposal to obtain approval for the placement and operation of the concrete batch plant and the bituminous hot-mix (asphalt) plant were part and parcel of the original application to the Town. By withdrawing them from further consideration, the Board's vote is of no effect and the matters are not pending either before the Town or before this Court. Nevertheless, the Court has provided its analysis to bring a final conclusion to that issue in the event the Court's decision on this procedural matter is found to be in error.

**4.    Alleged Bias, Arbitrary Action, Lack of Understanding of the LUO and Due Process**

LAW dedicates a majority of the brief in support of its complaint to highlighting alleged improprieties and procedural snafus committed by various board members during the hearing process. These arguments, along with record citations, are summarized briefly as follows.

**a.    The Chairman's Newspaper Statements**

Board Chairman Bradley Brann wrote a letter to the editor of The Courier Gazette expressing what LAW believes is a pro-Lane viewpoint. This letter appeared in the March 29, 2001 edition of The Courier Gazette, some six weeks prior to the first public hearing. Also, Chairman Brann made a statement appearing in the July 27, 2002

edition of The Courier Gazette. LAW asserts that this statement exhibits Chairman Brann's belief that LAW was interfering with the hearing process.

**b.  Statements Made to George Vandeventer**

LAW alleges that immediately after the first public hearing in May of 2001, Chairman Brann engaged in a dialogue with Mr. Vandeventer that shows a predisposition to decide in favor of Lane. The essence of this conversation was that Charlie Vanner (the owner of the parcel leased to Lane) "should have what he signed on for with Lane".

**c.  Statements Made to Budd Sloat**

Chairman Brann allegedly made statements to Mr. Sloat on at least two occasions in May of 2001 to the effect that the pollution coming from plumbing vent pipes and septic tanks is similar to what would emanate from the Lane project. Brann purportedly acknowledged that abutting residents would probably pack up and leave.

**d.  Chairman's Initial Refusal to Consider Hiring Own Experts**

LAW finds it telling that the Chairman was willing to accept the technical information provided by the applicant, even though he could not understand it himself. This supposedly indicates his predisposition to accept whatever Lane offered as conclusive.

**e.  The Chairman Ignored the Opposition (LAW)**

At a Planning Board work session, Chairman Brann stated that he had been "humoring them (LAW) for months. Also, LAW was allegedly denied time to make various presentations. Additionally, LAW was required to waive their right to submit rebuttal evidence before being granted time to make a final presentation.

**f.     The Chairman Violated LAW's rights to Equal Protection and Due Process**

LAW alleges that Chairman Brann singled individuals out for ridicule who opposed his anti-regulatory stance. (The constitutional ramifications of this allegation are not entirely clear, other than LAW's conclusion that such conduct "taints the entire proceeding").

**g.     The Chairman Impermissibly Relied Upon Outside Advise**

On a motion to deny the entire application, the Chairman cast the tiebreaking vote against the motion based on undisclosed information that was not subject to public review by other board members or the public. Chairman Brann also stated that he had received advice from the Maine Municipal Association (MMA) that appeared to be a deciding, or at least supporting, factor in his opinions. However, he was unable to restate the questions he had asked MMA and the advice given.

**h.     The Chairman Conducted Independent and Unspecified Research**

The Chairman referred to unspecified readings concerning the classification of a rock crusher vis-à-vis a quarrying operation. LAW alleges that these statements were made before the opposition had a chance to submit evidence, showing the Chairman's predisposition to rule against them.

**i.     The Board Arbitrarily Re-Opened, Then Closed, the Hearing Process**

LAW alleges that Lane was allowed to amend its application after the close of the hearing process without an opportunity for anyone to determine the impact of the revisions. This revision allowed for a 33% increase in extraction capacity.

### j.    The Board Arbitrarily Ignored the Advice of its Attorney

LAW alleges that the Board arbitrarily ignored its attorney at least twice during the hearing process. At the January 16, 2002 hearing, the Board failed to deny the entire application, then failed to deny the rock crusher.

### k.    The Board Did Not Understand the Role of the Opposition

The Chairman expressed his opinion that the Board could vote on the application before the Opposition had a chance to present its case.

LAW believes that the *Beckley* decision should dispose of this case. Alternatively, LAW believes the foregoing allegations show that it never received the fair hearing that it was entitled to. Therefore, a new hearing before the board is in order, and the sole issue at that hearing should be the legality of the quarrying operation[5].

Examining the evidence in the record and the application of law, to the extent the court affirms the decision of the Planning Board, the court is satisfied that there is sufficient evidence to support the conclusions and no evidence that the conclusions were the product of bias and prejudice on the part of the chairman. On the other hand, on remand, the Board will be required to make findings of fact in regards to whether the rock crusher is an accessory use under its ordinance keeping in mind the application of the terms "uses clearly incidental and subordinate to." In meeting its responsibilities to make the findings of fact, the members of the board will be required to apply a subjective as well as an objective standard to analyze the weight of the evidence and the credibility of the material that is before them. To the extent there is the necessity for a subjective analysis, it would appear from the record that there is sufficient indication of predetermination by its chairman to question the objective nature of the Board's

---

[5] Although it is not explained in detail, it seems that LAW believes the quarry is the only appropriate issue for the Board's consideration on remand because the other aspects of the proposal are, in its view, prohibited as a matter of law.

decisions, particularly on a 3-2 vote. On this limited question, the court believes that the chairman must recuse himself from consideration of this issue.

## 5. Is Lane Required to Pay the Town's Expenses?

The Board required lane to reimburse the Town in the amount of $20,497.70 for costs incurred in conducting the hearing process. Lane notes the legal requirement that application fees for conditional use permits must be enacted "according to a fee schedule established by the Planning Board". Washington, Me. LUO, Art. XI § 2 (March 23, 2002). Lane asserts that because there was no fee schedule in place when it filed its application, the Board has no authority to charge it for anything beyond the $50 filing fee. Further, Lane feels that it was coerced into paying the fee because it was not notified of the charges until substantial financial resources had been invested in the application process. Lane also cites to 1 M.R.S.A. § 302 and *Regan v. Racal Mortgage, Inc.*, 715 A.2d 925 (Me. 1998) in support of its position.

The Town believes that Lane's reading of Article XI of the LUO is overly restrictive. The Town further asserts that a fee for this process could not be accurately set in a schedule ahead of time without knowing the extent of any and all conditional use applications. Also, the Town points out that Article XI, Section 2(1) lays out the nature of anticipated costs, and therefore Lane had notice in advance of the charges. Moreover, the Town argues that Lane could not realistically believe that its $50 filing fee would cover the prospective expenses set out in the LUO. Finally, in response to Lane's charge of coercion, the Town contends that it merely submitted bills to Lane when various charges became certain, which necessarily occurred some time after the hearing process commenced. Also, the Town suggests that Lane could have decided the project was not worth pursuing and withdrawn its application. Thus, the town

asserts that this Court should uphold the Board's decision and order that the costs be paid in full before any permits issue[6].

LAW raises arguments in favor of the Town's position that largely mirror those set out in the Town's opposition brief. Additionally, LAW asserts that Lane may not now seek review of the Board's decision to impose these fees because Lane failed to appeal[7].

Lane responds to LAW by stating that it did in fact appeal this part of the Board's decision.

The operative language relied upon by the parties is very ambiguous and it is not surprising that there is an issue. However, the court is satisfied that there is sufficient language to make it clear that there is a fee *required to accompany the application* and that it is scheduled by the Town to be $50. (Emphasis supplied). It is also clear that the ordinance provides a right of the Town to assess the applicants the costs as described. Whether those costs, in this case, are reasonable under all of the circumstances is an issue of fact not before this court, but to the extent the issue must be decided whether the Town has the authority to assess such costs, the court is satisfied that it does.

The entry will be:

> The Town of Washington Planning Board decision of August 5, 2002, granting The Lane Construction Corporation a conditional use permit to operate and maintain mineral extraction operations is AFFIRMED; the decision of the Town of Washington Planning Board of August 5, 2002, granting The Lane Construction Corporation a conditional use permit to operate and maintain a crushing operation is REVERSED and the matter is REMANDED to the Town of Washington Planning Board to make findings of fact in accordance with this decision; the decision of the Town of Washington Planning Board to deny the request of The Lane Construction Corporation for asphalt and concrete plants in the FF District is not before this Court; the order of the Town of

---

[6] Apparently, Lane has paid only $10,000.00 (under protest) of the accrued charges. *See* L-7; T-59, pg. 8.
[7] It is assumed that LAW is asserting that Lane did not appeal this portion of the Planning Board decision to the Board of Appeals.

Washington Planning Board requiring a reimbursement for expenses from The Lane Construction Corporation as part of the application process is AFFIRMED; matter REMANDED to the Town of Washington Planning Board for proceedings consistent with this Decision and Order.

Dated: March 25, 2005

Donald H. Marden
Justice, Superior Court

Date Filed __6/18/03__ ____Knox____ Docket No. ___AP-03-011___
County

**Atwood, J. recuses 2/5/04**

Action ___80B Appeal___

LAND ASSOCIATION OF WASHINGTON,
ROBERT MARKS,
PAULA GREEN, LOWELL FREIMAN, JOAN FREIMAN,
ZOLA COOGAN, SANDRA BOURRIE, GUY BOURRIE,     INHABITANTS OF THE TOWN OF WASHINGTON,and
STEVE OCEAN,KATHY OCEAN and ANN N. FARLEY vs. LANE CONSTRUCTION CORPORATION

| Plaintiff's Attorney<br>Robert Marks, Esq.<br>PO Box 326<br>Washington ME  04574<br>845-2800 | Defendant's Attorney<br>Edmond J. Bearor, Esq. (Lane Construction)<br>PO Box 1401<br>Bangor ME  04402      947-4501<br><br>Lee K. Bragg, Esq. (Town of Washington)<br>PO Box 5057<br>Augusta ME  04332      623-1596 |

| Date of<br>Entry | |
|---|---|
| 6/18/03 | 80B Appeal and Summary Sheet filed by Attorney Marks. |
| 6/18/03 | Notice and Briefing Scheduled mailed to Attorneys Marks, Lee Bragg, and Edmond Bearor. |
| 7/14/03 | Edmond J. Bearor, Esq. enters his appearance on behalf of the Defendant, Lane Construction. |
| 7/14/03 | On 7/11/03, Lee K. Bragg, Esq. enters his appearance on behalf of the Defendant, Town of Washington. |
| 7/15/03 | Return of Notice and Acknowledgment of Receipt of Services of Process filed:<br>-Edmond Bearor, Esq. accepts service on behalf of Lane Construction.<br>-Lee Bragg, Esq. accepts service on behalf of Town of Washington on 6/27/03. |
| 7/24/03 | Plaintiffs' Motion to Enlarge Time to Submit Record and Proposed Order filed by Attorney Marks. |
| 7/25/03 | Plaintiffs' Initial Brief filed by Attorney Marks. |
| 8/15/03 | On 8/14/03, Order (RE: Motion for Enlargement of Time to Submit Record) filed:<br>Granted. (Record due 8/15/03)<br>Dated: º8/4/03<br>Studstrup, J.<br>Copy mailed to Attorneys Marks, Bearor and Bragg. |
| 8/15/03 | On 8/13/03, Plaintiffs' Motion to Enlarge Time to Submit Record and Proposed Order filed by Attorney Marks. |
| 8/25/03 | Order filed: |

Date Filed ___6/26/03___  ___Knox___  Docket No. ___AP-03-013___

County

**ATWOOD, J.** recuses 3/1/04

Action ___80B Appeal___

LAND ASSOCIATION OF WASHINGTON (INTERVENERS)

THE LANE CONSTRUCTION COMPANY ,vs. TOWN OF WASHINGTON

| Plaintiff's Attorney | Defendant's Attorney |
|---|---|
| Edmond J. Bearor, Esq.<br>Timothy A. Pease, Esq.<br>PO box 1401<br>Bangor ME 04402-1401<br>947-4501 | Lee K. Bragg, Esq.<br>Michael A. Hodgins, Esq.<br>PO box 5057<br>Augusta ME 04332<br>623-1596 |
| | Theodore A. Small, Esq. (Town of Washingto<br>PO Box 9729<br>Portland ME 04014<br>774-1200 |

| Date of Entry | | Robert Marks, Esq. (Intervenors)<br>PO Box 326<br>Washington ME 04574   845-2800 |
|---|---|---|
| 6/27/03 | On 6/26/03, 80B appeal; summary sheet and $100 fee filed by Attorneys Bearor and Pease. | |
| 6/27/03 | Notice and Briefing Scheduled mailed to Attorneys Bearor, Pease and the Town of Washington. | |
| 7/1/03 | Return of Service on Summons filed:<br>-Town of Washington served through Cheryl L. Ten Broeck on 6/27/03. | |
| 7/11/03 | Lee K. Bragg, Esq. enters his appearance on behalf of the Town of Washington.<br>Michael A. Hodgins, Esq. enters his appearance as co-counsel for Defendant. | |
| 7/25/03 | Plaintiff's Motion for Enlargement of Time filed by Attorney Bearor. | |
| 8/15/03 | On 8/14/03: Order (RE: Motion to Enlarge Time) filed:<br>Motion Granted and Time enlarged to 8/19/03.<br>Dated: 8/14/03<br>Studstrup, J.<br>Copy mailed to Attorneys Bearor, Pease, Bragg and Hodgins. | |
| 9/16/03 | Plaintiff's Motion for Enlargement of Time and Propose Order filed by Attorney Pease. | |
| 9/17/03 | Second Plaintiff's Motion for Enlargement of Time and Proposed Order filed by Attorney Pease. | |
| 9/18/03 | Brief filed by Attorney Marks. Joint Record with AP-03-011. | |
| 10/1/03 | Order filed: | |